1
2
3
4
5
6
7
8
9           **UNITED STATES DISTRICT COURT**

10         **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  WORTH BARGAIN OUTLET, INC. dba                    CASE NO. 09CV839 DMS (WMc)
    WORTH BARGAIN OUTLET,
13                                                    **ORDER GRANTING IN PART**
                                        Plaintiff,    **AND DENYING IN PART**
14        vs.                                         **DEFENDANT'S MOTION FOR**
                                                      **SUMMARY JUDGMENT**
15
                                                      [Doc. 41.]
16  AMCO INSURANCE COMPANY,

17                                      Defendant.

18

19        Plaintiff Worth Bargain Outlet, Inc. ("Worth") brings this action against its insurer, Defendant

20  AMCO Insurance Company ("AMCO"), for: (1) breach of contract, (2) breach of the implied covenant

21  of good faith and fair dealing ("bad faith"), and (3) violations of California's Unfair Competition Law

22  ("UCL"), Cal. Bus. & Prof. Code § 17200, *et. seq*. Defendant has filed a motion for summary

23  judgment on all three claims, as well as on Plaintiff's claims for punitive damages.  For the reasons

24  set forth below, Defendant's motion is granted in part and denied in part.

25                                         **I.**

26                                    **BACKGROUND**

27        Plaintiff is a corporation owned by Randal Goomer ("Goomer") and Seema Goomer, husband

28  and wife.  In November, 2003, Worth opened a retail discount store in San Marcos, California, on

1   property leased from the Rite Aid Corporation ("Rite Aid").   On November 16, 2006, there was a fire

2   at the Worth retail store, which damaged business personal property and forced Plaintiff to suspend

3   its business operations.   (*See* Pl.'s Statement of Genuine Issues in Support of Pl.'s Opp'n to Def.'s

4   Mot. for Summ. J. Facts at 15, 16.)

5        The loss was covered by a Businessowners Insurance Policy ("the Policy") that Plaintiff

6   obtained from Defendant in July 2006.  (Kwasniewski Decl., Ex. A, p.1.)  In the event of a casualty

7   loss, the Policy provided coverage for, among other things, (1) "Business Personal Property," (2)

8   "Business Income Loss," and (3) "Extra Expenses."  "Business Personal Property" provided up to

9   $243,000 of coverage for "[p]ersonal property...in your business, including but not limited to furniture,

10  fixtures, machinery, equipment, and 'stock'." (*Id.* at 5, 10.)  "Business Income Loss" covered the

11  "actual loss of 'business income' you sustain due to the necessary suspension of your 'operations'

12  during the 'period of restoration.' (*Id.* at 15.) Business Income was further defined as the "Net Income

13  (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss

14  or damage had occurred . . . plus normal operating expenses incurred, while 'operations' are

15  suspended, including payroll." (*Id*. at 36.)  "Extra Expense" covered expenses incurred "[t]o avoid

16  or minimize the suspension of business and to continue 'operations': At the described premises...."(*Id*.

17  at 43.)

18       In the event of a loss, the Policy required Plaintiff to provide a "complete inventory of damaged

19  and undamaged property.  Include quantities, costs, values...of each item."  In addition, the insurer was

20  entitled "as often as may be reasonably required...[to] examine...books and records, including financial

21  records and tax returns." (*Id.* at 33)  The Policy also required the cooperation of Plaintiff in the

22  investigation and settlement of a claim. (*Id*.)

23       After the fire, Defendant assigned Stefani Bomar as the adjustor for Plaintiff's claim. (Bomar

24  Decl., ¶ 3.)  Bomar promptly contacted Plaintiff and traveled to the property to inspect the loss.  (*See*

25  Pl.'s Statement of Genuine Issues in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J. Facts at 18.**)**

26  On November 17, 2006, Bomar requested that Greer & Kirby ("Greer"), a salvage expert, inspect the

27  loss and prepare an inventory listing the merchandise damaged by the fire. (*Id*. at 21.) Greer performed

28  an inspection of the damaged inventory it collected and prepared an inventory list. (Bomar Decl., ¶ 5.)

1   Greer forwarded that list to Plaintiff and requested that Plaintiff provide the "cost value" and "back
2   up cost invoices" for the items listed. (Bomar Decl., Ex. B, ¶ 7.)

3          On December 3, 2006, the store was reopened to customers. (Beck Dep.70:19-70:23; Fodera
4   Decl., Ex. AA, GG.)   On December 12, 2006, Goomer wrote a letter to Bomar requesting funds.
5   (Kwasniewski Decl. Ex. G.)   On December 15, 2006, Defendant retained the services of Kinsel
6   Accountancy Corporation to assist in the valuation of Plaintiff's losses. (Bomar Decl., ¶ 8; Kinsel
7   Decl., ¶ 2.) On December 18, 2006, Bomar visited the Defendant's place of business and provided
8   him with a check for $30,000. (Goomer Decl. ¶ 34.)

9          On January 3, 2007, Plaintiff provided Defendant with the purchase costs for the items listed
10  on the Greer inventory list.   (Bomar Decl., ¶ 10, Ex. C.)   The items listed by Plaintiff totaled
11  $164,182.39. (Bomar Decl., ¶ 10, Ex. C.) On January 12, 2007, Plaintiff wrote a letter to Defendant
12  asking for $676,400 in policy benefits. (Fodera Decl., Ex. M.)  Plaintiff compiled a spreadsheet of
13  costs associated with the fire, including damaged inventory, rent and payroll, and costs for cleanup.
14  (*Id.*) Plaintiff informed Defendant that the $30,000 advance was insufficient, noting that Quick Dry,
15  an emergency clean-up service company who repaired flooding caused by fire sprinklers, was
16  threatening levies.  (*Id.*).

17         On January 16, 2007, Defendant responded to Plaintiff's letter by requesting documentation
18  to substantiate Plaintiff's demands, including an inventory of Plaintiff's goods prior to the fire and
19  purchase invoices to confirm the purchase costs submitted earlier with the Greer inventory list. (Pl.'s
20  Statement of Genuine Issues in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J. Facts at 33.)

21         Thereafter, Plaintiff hired attorney Warren Beck to assist him with his claim. (*Id.* at 35.)  On
22  February 23, 2007, Bomar sent a letter to Beck reiterating the information contained in the January 16,
23  2007 letter to Goomer. (Fodera Decl., Ex. LL.)  Beck also spoke with the accountant, Kinsel, and
24  received a letter from Kinsel requesting: (1) a detailed claim for the business interruption loss; (2)
25  profit and loss statements (annual for 2005 and monthly for January 2005 through February 2007); (3)
26  balance sheets as of the end of 2005, the end of 2006 and the date of loss, if available; (4) records
27  detailing monthly sales from January 2005 through February 2007; (5) payroll records from September
28  2006 through February 2007; (6) a copy of the lease agreement; (7) detail of extra expenses incurred

as a direct result of the fire and receipts or invoices supporting the costs of these items.(Fodera Decl., Ex. MM.)  Defendant sent follow-up letters in March, April and May requesting the documentation. (Fodera Decl., Ex. BB, CC, DD.)

Plaintiff e-mailed Kinsel several financial documents on May 17, 2007 including, but not limited to, 2005 and 2006 income statements and balance sheets, profit and loss statements for 2005, 2006, and 2007, and federal tax filings.  (*See* Kwasniewski Decl., Ex. J.)  At the time, Plaintiff also forwarded a damage summary claiming $1,358,115 in past and estimated future losses. (*See* Pl.'s Statement of Genuine Issues in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J. Facts at 47.)  On May 19, 2007, Plaintiff emailed Defendant a proof of loss statement and a series of purchase invoices to substantiate the purchase price of items listed in the Greer inventory. (Kwasniewski Decl., Ex. K.)

Upon receipt of Plaintiff's financial documents, Defendant noted several discrepancies, such as  discrepancies in Plaintiff's 2006 profit and loss report calculations, inconsistences in the 2006 and 2007 beginning and ending inventory amounts, and contradictions between the tax schedules and profit and loss reports.  (Fodera Decl., Ex. FF.)  Additionally, Defendant noted that the 2005 and 2006 income statements prepared for tax purposes showed losses for 2005 and 2006, while the 2005 and 2006 income statements prepared by Plaintiff represented substantial profits. (Kwasniewski Decl. Ex. J p. 196, 203, 204.)  On May 22, 2007, Defendant faxed Plaintiff a letter requesting clarification of the discrepancies, as well as bank statements for 2006 and 2007 and payroll reports and monthly income reports.  (*See* Pl.'s Statement of Genuine Issues in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J. Facts at 49.)  Plaintiff provided explanations for these discrepancies and provided the requested bank statements, payroll reports, and income statements. (Fodera Decl., Ex. GG.)

Defendant continued to review Plaintiff's documentation, and on July 2, 2007, Defendant contacted Plaintiff seeking supporting documentation to substantiate losses regarding computer repairs, software installation, water heater and plumbing repairs, electrical repairs, and advertising. (Bomar Decl., ¶ 24.)  Plaintiff agreed to submit the requested documentation and agreed to a face-to-face meeting (*Id*. at 25.)

On July 26, 2007, Goomer and Beck met with Bomar and Kinsel to resolve outstanding issues related to the claim.  Bomar presented Goomer with a check for $171,908, which, with the earlier

payment of $30,000, brought the total payment made by Defendant to $201,908.  Bomar advised Goomer that Defendant would consider additional payments for loss if additional documents were provided to substantiate Plaintiff's claims. (Bomar Decl., ¶ 26.)  Goomer requested that Defendant conduct a fuller review of Plaintiff's prior sales history, which prompted a request by Kinsel to produce financial statements for 2003 and 2004, check registers, general ledgers, payroll registers and proof of advertising expenditures for the entire period of the claim in order to verify further losses claimed by Plaintiff. (Kinsel Decl., ¶ 9.)  At the end of the July 26, 2007 meeting, Beck provided Defendant with a letter which detailed three points of clarification regarding the result of the meeting: (1) "[T]he amount of $171,908 represents the minimum amount of benefits owed...and there will be further settlement discussions"; (2) Plaintiff will provide 2004 monthly income statements, check registers from 2004 to 2007, payroll register from May 2007 through July 2007, and will partake in a joint telephone conference with Defendant's accountant to confirm accounting practices utilized; (3) Rite-Aid has paid the emergency services invoice of Quick-Dry and if Rite-Aid seeks reimbursement from Plaintiff that Defendant will subrogate the claim. (Fodera Decl., Ex. R.)

On the evening of July 26, 2007, Plaintiff emailed Defendant stating that he did not agree with the calculation used by Kinsel regarding inventory calculations, seasonal revenue increases for November and December, and lack of price discounting for soiled merchandise from the fire. (Goomer Decl., Ex. 3.)  In addition, the letter explained that Plaintiff was seeking an accounting professional and that Beck was no longer Plaintiff's legal representative. (*Id*.)

On August 3, 2007, Kinsel e-mailed Plaintiff restating their request for documents from the July 26, 2007 meeting.  (Fodera Decl., Ex. S.)  Kinsel and Bomar sent follow-up letters in September. (Kinsel Decl., Ex. B; Bomar Decl., Ex. E.)  On September 18, 2007, Plaintiff responded by requesting that Defendant provide a written explanation of the how the $171,908 loss payment on July 26, 2007 was calculated and the basis for not paying additional loss claims requested by the Plaintiff.  (Fodera Decl., Ex. T.)

On October 8, 2007, the breakdown of the $201,908 loss payment was provided to Plaintiff. The following damages were included in this payment: $64,702 for inventory loss as projected by Greer; $5,992 for employee-discarded inventory loss as projected by Defendant; $7,000 floor cleaning;

$750 for plumbing repairs and hot water heater replacement; $400 for electrician costs; $2,613 for computer replacement costs; $5,795 for software reinstallation; $6,840 for front door repair; $2,250 for HVAC system cleaning; $2,200 for fire sprinkler system recharge; $6,909 for shelving repair ; and $96,457 for projected business income loss through April 2007. (*Id.*; *see also* Fodera Decl., Ex. P.) In addition, Defendant explained that the $30,000 advance payment was made under the Business Personal Property coverage for anticipate losses on items necessary to keep the business in operation. (Fodera Decl., Ex. U). Kinsel further inquired about the documentation requested at the July 26, 2007 meeting. (Kinsel Decl., Ex. E, F.)

On December 6, 2007, Defendant received a letter enclosing a handwritten inventory of all items in the store in August and September of 2007, all bank statements from 2004 through 2007, with exception some 2003 statements lost in the fire, all cancelled checks issued by Plaintiff, photographs taken after the fire, and all bank wires to vendors and vendor invoices. (Kwasniewski Decl., Ex. U.) On December 13, 2007, Kinsel e-mailed Plaintiff advising that the documentation was not what was requested in that it lacked check registers, general ledgers, etc. (Kinsel Decl., Ex. H.) That same day Defendant informed Plaintiff that his submission of documents was non-responsive and re-requested the same documentation. (Bomar Decl., Ex. G.)

The parties continued their back and forth regarding documentation into 2008. In early 2008, Plaintiff retained Greg Stafford of Premier Claim Consultants ("Premier"), a public adjusting firm, to assist Plaintiff in managing his ongoing claim with Defendant. (Stafford Dep. 40:6 - 40:12.) Premier informed Defendant it would be representing Plaintiff as its public insurance adjustor and requested documentation and a face-to-face meeting of the parties in order to resolve any pending matters between Plaintiff and Defendant. (Kwasniewski Decl., Ex. Z.) On April 28, 2008, Premier sent Defendant a letter stating it was still awaiting: (1) clarification as to whether Plaintiff's business income claim was the only unresolved claim; (2) confirmation of covered exposures; (3) documentation as to what loss claims have been denied; (4) policy citations corresponding to factual and legal basis for the denial of claims thus far. (Kwasniewski Decl., Ex. AA.) On May 9, 2008, Defendant responded to this letter by providing a copy of Plaintiff's policy along with a spreadsheet detailing what claimed losses have been settled and what documentation was still necessary to resolve

outstanding claims. (Fodera Decl., Ex. N.)

On July 11, 2008, Defendant sent a letter to Plaintiff seeking a status update on the requested documentation. (Fodera Decl., Ex. F.) On August 6, 2008, Plaintiff responded, via its adjustor Premier, with revised profit and loss calculations for 2003 through 2008 detailing an estimated business income loss of $1,461,080.00. The response also included more detailed payroll summaries and several other financial documents. (Kwasniewski Decl., Ex. YY.)

Defendant forwarded these documents to Kinsel for an accounting review. Kinsel advised Defendant that the documents did not match those previously requested and lacked the information necessary to evaluate further loss claims. (Kinsel Decl., Ex. I.) In addition, Kinsel noted that the information in the documents contradicted previously submitted information; specifically the profit and loss statements submitted in April 2007. (*Id*.)

On November 7, 2008, Plaintiff, via Premier, responded to these letters by stating that Plaintiff had submitted all the documentation necessary for Defendant to resolve its claim. (Fodera Decl., Ex. J.) On November 12, 2008, Leslie Bratz ("Bratz"), Bomar's claim manager, contacted Premier and arranged a meeting for November 20, 2008, in an attempt to resolve outstanding claim issues. (Bratz Decl., ¶ 3.) On November 19, 2008, Plaintiff informed Defendant that Goomer would not be attending their previously scheduled meeting. (Fodera Decl., Ex. J.) On December 5, 2008, Bratz sent a letter to Plaintiff summarizing the outstanding issues on the claim. (Fodera Decl., Ex. J.) On February 2, 2009, Defendant closed the file on Plaintiff's claim. No responsive communication was received regarding the December 5, 2008 letter prior to Defendant's closing of the claim. (Bratz Decl., ¶ 9.) On April 22, 2009, Plaintiff filed the instant lawsuit. (Doc. 1.)

## II.

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the opposing party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, it must designate specific facts showing there is a genuine issue for trial. *Id.* More than a "metaphysical doubt" is required to establish a genuine issue of material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**III.**

**DISCUSSION**

Defendant argues it is entitled to summary judgment because Plaintiff could not substantiate the amount of benefits it was seeking under the Policy. Defendant contends it paid the amounts it could verify, as well as amounts it could not verify, and, thus, Plaintiff cannot prove that Defendant breached the contract or acted in bad faith.[1]

**A. Breach of Contract**

"The standard elements of a claim for breach of contract are '(1) the contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) damage to the plaintiff therefrom.'" *Abelhamid v. Fire Ins. Exchange*, 182 Cal. App. 4th 990, 999 (2010) (quoting *Wall Street Network, Ltd. V. New York Times co.*, 164 Cal . App. 4th 1171 (2008). Plaintiff argues that the claim payment it received under the policy was unreasonably low and improperly calculated, evidencing Defendant's breach. Defendant, however, maintains it did not breach the insurance contract because it paid the amounts it could substantiate based on the documentation provided by Plaintiff. Thus, the

---

[1] The parties each filed evidentiary objections. Defendant's objections to the Goomer and Raffaele declarations are overruled, except as follows: sustained as to Goomer's declaration paragraph 47, regarding AMCO/Kinsel's "agenda," and paragraph 72, lines 10-11, starting with "based on" and ending with "more documents." The remaining objections are denied as moot.

issue confronted in Plaintiff's breach of contract claim is whether Plaintiff's financial documentation was sufficient for a loss valuation greater than that awarded by Defendant. To that end, genuine issues of material fact exist.

### 1. Inventory

The parties dispute how to properly calculate Plaintiff's inventory loss. Plaintiff informed Defendant that it purchased its inventory in large lots from Costco at a 27% discount of Costco's selling price per item. (Goomer Decl. ¶¶ 9-10.) Defendant, therefore, valued Plaintiff's inventory, taken from the Greer inventory list, by multiplying the Costco selling price by 27%, and arriving at a figure of $64,702 for inventory loss. Plaintiff contends that simply multiplying the price by 27% is insufficient to accurately value the inventory. Rather, once the items were purchased from Costco, Plaintiff had to sort through the inventory and discard many items that were unsaleable. Thus, the costs associated with retrieving, sorting, discarding, processing, and shelving the Costco inventory increased the cost of the inventory. (Raffaele Depo. 236:19-237:17.) Accordingly, there is a question of fact as to how to properly value the inventory.

### 2. Business Income

The parties also dispute the proper measure of Plaintiff's business income loss. Plaintiff received $96,457 in business income losses. Plaintiff contends this amount is insufficient on several grounds. First, Defendant failed to take into account Plaintiff's higher sales trends in November and December. When creating the business income valuation, Kinsel was aware of the high trends in those two months. (Kinsel Depo.197:1-198:2.) Nonetheless, Kinsel declined to consider it because Worth began purchasing stock from Costco in 2005, which affected the analysis. (*Id.* at 198:3-199:20.) In addition, Kinsel possessed reservations about the accounting methodology employed by Plaintiff. Thus, in Kinsel's opinion, it would have been improper to consider any possible high trends in November and December. However, Plaintiff's expert, Greg A. Raffaele ("Raffaele") , considered the November and December high trends in reaching his valuation opinion. (Raffaele Decl. Ex.2.)

Second, Plaintiff argues Defendant should have considered its bank statements and cancelled checks in making the business income valuation. Defendant argues the bank statements and cancelled checks were insufficient. For example, a bank statement may show a deposit, but it is unclear whether

1   that deposit represents sales or money received from a loan. Likewise, the cancelled checks did not

2   always give a last name or explain in the memo the purpose for the payment.  Raffaele, on the other

3   hand, testified that bank statements and cancelled checks are useful because they provide objective,

4   verifiable information, and can fill in gaps where a small business may have incomplete accounting

5   information.  (Raffaele Depo. 54:22-24; 69:1-16; 90:9-15; 93:18-94:2.)  Raffaele was able to arrive

6   at an opinion on business income using the bank statements and cancelled checks.

7           Third, Plaintiff contends the business income valuation was too low because it was only paid

8   through April 2007 and should have been paid through November 2007.  The policy provides for a

9   business income payment during the "period of restoration," which is a period of up to 12 months

10  beginning on the date of loss and continuing to "[t]he date when the property at the described premises

11  should be repaired, rebuilt or replaced with reasonable speed or similar quality." (Kwasniewski Decl.,

12  Ex. A, p. 35-36.)  Although the store reopened in December 2006, it was in poor condition, and

13  Goomer contends the store never truly "reopened."  (Goomer Decl. ¶¶ 23-4.)  It is unclear from the

14  current record at what point Plaintiff should have been fully operational following the fire, and thus,

15  the date through which Plaintiff should have received a business income payment.

16          Accordingly, there are genuine issues of material fact as to whether the business income

17  payment Plaintiff received was the correct measure of its losses.

18              *3.  Extra Expense*

19          Extra Expense is defined by the policy as any "expense incurred: To avoid or minimize the

20  suspension of business and to continue 'operations'..." (Exhibit A, pg.4.)  Plaintiff claims it incurred

21  certain business related expenses, *e.g.*, advertising expenses, which fell under the extra expense

22  coverage and were not reimbursed by Defendant.  (*See* Kwasniewski Decl. Ex. MM (invoice for

23  custom banners).) Defendant contends that it reimbursed Plaintiff for all claims under this coverage

24  that were supported by documentation. (Bomar Decl. ¶ 24.)   Therefore, triable issues of material fact

25  exist as to whether Plaintiff was properly reimbursed for extra expenses it incurred.

26          Accordingly, Defendant's motion for summary judgment of Plaintiff's breach of contract claim

27  is denied.

28  / / /

**B. Bad Faith**

The law implies in every contract, including insurance policies, a covenant of good-faith and fair dealing. *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007). In the insurance context, the implied covenant requires the insurer to refrain from injuring the insured's rights to receive the benefits of the insurance agreement. *Id.* It "has 'particular application' to insurers because they are 'invested with a discretionary power affecting the rights of another,' and the insurance business is 'affected with a public interest and offers services of a quasi-public nature[.]'" *Amadeo v. Principal Mutual Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002) (citations omitted). While an insurance company has no obligation under the implied covenant of good-faith and fair-dealing to pay every claim its insured makes, the insurer cannot deny the claim without fully investigating the grounds for its denial. *Wilson*, 42 Cal. 4th at 721.

An insurers denial or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable. *Wilson*, 42 Cal. 4th at 723. A defendant must be reasonable, but not flawless, in its handling of a claim. *California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 55 (1985). Although the issue of reasonableness "is ordinarily a question of fact[,]" *Highlands Ins. Co. v. Continental Casualty Co.*, 64 F.3d 514, 517 (9th Cir. 1995) (citing *Walbrook Ins. v. Liberty Mut. Ins.*, 5 Cal. App. 4th 1445, 1454 (1992)), Defendant argues it is entitled to judgment on this issue under the genuine issue, or genuine dispute as to coverage, doctrine. This doctrine allows a court to "conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." *Guebara*, 237 F.3d at 992 (quoting *Lunsford v. Am. Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994)). The genuine dispute doctrine was originally invoked in cases involving disputes over interpretation of policy language, however, in recent years the courts have applied it to factual disputes as well. *Wilson*, 42 Cal. 4th at 723; *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292-93 (2000); *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992-94 (9th Cir. 2001).

"Because the key to a bad faith claim is whether denial of a claim was reasonable, a bad faith claim should be dismissed on summary judgment if the defendant demonstrates that there was 'a genuine dispute as to coverage.'" *Feldman v. Allstate Insurance Company* 322 F.3d 660, 669 (9th Cir.

2003) (citation omitted).  The genuine dispute rule in no way alters the standards for deciding and reviewing motions for summary judgment.  *Wilson*, 42 Cal. 4th at 724. "[A]n insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claims is not liable in bad-faith even though it might be liable for breach of contract.  *Id*. (quoting *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, 90 Cal. App. 4th 335, 347).  "The mistaken withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability."  *Tomaselli v. Transamerica Ins. Co.,* 25 Cal.App.4th 1269, 1280-81 (1994). "[T]he standard for determining whether a dispute is 'genuine' under this doctrine is entirely objective.  Disposition turns on whether the insurer can establish that, at the time it disputed the claim, and given what it knew or should have known, a carrier, reasoning objectively, could rationally have taken the positions on the issues that the defendant took." *Bernstein v. Travlers Ins. Co.*, 447 F. Supp. 2d 1100, 1110 (N.D. Cal. 2006); *see also CalFarm Ins. Co. v. Krusiewicz*, 131 Cal. App. 4th 273, 286 (2005) (citing *Chateau Chambery*, 90 Cal. App. 4th at 346-47).

Plaintiff makes several arguments in support of its claim that Defendant acted in bad faith.  Each is addressed in turn.

### 1. Investigation

The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim.  *Wilson*, 42 Cal. 4th at 723.  Plaintiff, citing *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1623 (1996), argues Defendant acted unreasonably in its investigation by "ignoring evidence available to it which supports the [Plaintiff's] claim."  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 10:2-12.)  In *Mariscal*, the defendant insurer denied a claim based on evidence showing the insured died of an illness, not the accident at issue in the claim.  *Mariscal*, 42 Cal. App. 4th at 1619.  However, an effective investigation of medical records and interviewing of the treating doctor and hospital staff would have strongly indicated that the death of the insured was due to the accident.  *Id*. at 1624.  The court determined the insurer acted unreasonably by failing to seek to discover evidence relevant to the issues of liability and damages.

*Id.* at 1619.  In the instant case, it cannot be said that Defendant failed to seek out the evidence necessary to properly and fairly adjust the claim.  Defendant continually requested documentation from Plaintiff and sent follow-up letters when the documentation was not forthcoming.  Plaintiff has not put forth any evidence which Defendant could or should have obtained, but which Defendant failed to request.  Once Defendant was provided the documents it requested, they were evaluated by an accounting firm, and thereafter payment was offered and accepted by Plaintiff.  Thus, Plaintiff has not raised a triable issue of fact that Defendant's investigation was unreasonable.

### 2. Delays

Plaintiff argues that payment for all of Plaintiff's claims, including lost inventory was unreasonably delayed.  However, the time-line of events does not support this proposition.  Defendant responded immediately to Plaintiff's claim by sending out an adjuster and procuring a salvage expert to compile an initial inventory list.  On December 6, 2006, less than a month after the date of loss, Plaintiff received a copy of the inventory list and was asked to insert values for each inventory item.  Plaintiff did not return the list to Defendant until January 3, 2007.  On January 16, 2007, after Plaintiff requested more than $600,000 in policy benefits, Defendant requested substantiation of Plaintiff's claims.  Plaintiff did not provide such documentation until May 19, 2007, when Plaintiff emailed Defendant over 100 pages of financial documents.  Defendant then noted several discrepancies in Plaintiff's documentation, which subsequently required clarification.  At a meeting between the parties on July, 26 2007,  Defendant provided a lump-sum payment that included an inventory loss of approximately $70,694.  This figure included unsubstantiated inventory losses reported by Plaintiff.  Given the complexity and discrepancies that existed in the financial documentation, there is no basis to conclude based on the undisputed evidence that Defendant unreasonably delayed in providing inventory loss payments by taking a little over two months to finalize its valuation.

### 3. Advances

Plaintiff argues Defendant acted unreasonably by failing to advance payment for inventory, extra expense, and continuing expenses, such as payroll.  Plaintiff contends that the policy's "extra expense" coverage implies in its language that Defendant was obligated to advance payments for losses that exceeded the normal operating expenses of the Plaintiff.  However, an insurance company

1   has no obligation under the implied covenant of good-faith to pay every claim that it is presented with

2   without completing its investigation. *Wilson*, 42 Cal. 4th at 720. Notwithstanding Defendant's

3   obligation to pay for losses under either coverage, the procedure by which it provides these loss

4   payments is governed by the express terms of the policy. *Brehm v. 21st Century*, 166 Cal. App. 4th

5   1225, 1235; *see also Waller v. Truck Ins. Exch.*, 11 Cal . 4th 1, 35-36 (1995) (stating that the implied

6   covenant of good faith is governed by the express terms of the insurance policy). Plaintiff does not

7   cite anything in the insurance policy or any legal precedent that requires Defendant to advance a

8   payment, especially in light of the fact that Plaintiff and Defendant genuinely dispute the cost of

9   inventory and the length of the period of restoration.[2]

10          *4. Valuations*

11          Plaintiff claims that the inventory valuation was "unreasonably" low. However, Defendant's

12   valuation was based on information obtained from Plaintiff, *i.e.,* that Plaintiff purchased its inventory

13   from Costco at 27% of the sale price. Plaintiff objected to this discount percentage as being too low

14   because of sorting, discarding, and processing fees. Defendant, on the other hand, contended that these

15   factors are not part of the "cost" valuation. When a genuine dispute relates to contract interpretation,

16   the insurers reasonableness is a question of law to be decided by the court. *Chateau Chambery*

17   *Homeowners Association*, 90 Cal. App. 4th 335, 348 n.7 (2001). Defendant's interpretation of "cost"

18   as gleaned from the language of the policy is reasonable. Plaintiff has posited no evidence that

19   Defendant's interpretation is grossly at odds with standard accounting practices. In light of this

20   dispute, Defendant was not acting unreasonably when calculating the loss payment for inventory even

21   if a substantial disparity existed in the scope and costs of the claim. *Fraley*, 81 Cal. App. 4th at 1293.

22          Similarly, Plaintiff claims that the business income calculation by Defendant was unreasonably

23   low because: (1) the business income calculation disregarded historical trends of sales increases in

24   November and December; (2) the business income valuation misstated the period of restoration; (3)

25   _____

26          [2] There is some dispute as to the purpose of the $30,000 advance provided by Defendant.
     Goomer states that when he received the advance he was told it was for the Quick Dry emergency
27   services bill. (Goomer Decl., ¶ 34.) Bomar contends the advance was simply for Plaintiff's damages.
     (Bomar Decl., ¶ 9.) This does not raise a triable issue of fact, however, because it is undisputed that
28   Plaintiff did not use the $30,000 for the Quick Dry bill. Rather, the Quick Dry bill was paid by Rite
     Aid. (*See* Fodera Decl., Ex. R.) Therefore, Defendant applied the $30,000 toward Plaintiff's Business
     Personal Property Coverage. (Fodera Decl., Ex. U.)

1  the business income calculation ignored bank statements and cancelled checks.

2      Plaintiff suggests that an internal communication between Bomar, the adjustor managing the

3  claim for Defendant, and Tim Johnson, supervisor to Bomar, demonstrates bad-faith regarding the

4  November and December high trends.  The e-mail communication suggested that both Bomar and

5  Johnson thought that Kinsel may have undervalued the business income figure by not incorporating

6  trends in the financial documentation submitted by Plaintiff. (Kwasniewski Decl., Ex. QQ.)  However,

7  the e-mail correspondence goes on to explain that Kinsel had a rationale for not fully incorporating the

8  trend.  (*Id*. at RR.)  Bomar explained to Johnson that Kinsel had reservations "about [Plaintiff's]

9  accounting practices.  During the meeting we requested that [Plaintiff's] accountant contact Kinsel to

10 sort out those issues."  (*Id.*)  No inference can be drawn from these facts that would support the

11 conclusion that Bomar and Johnson were acting in bad-faith by deferring to Kinsel's calculations.

12     Second, as discussed earlier, Plaintiff disputes the period of restoration that is utilized by

13 Defendant in its calculation of the business income loss.  While this may indicate a breach of contract,

14 there is nothing in the record that would suggest bad-faith.  Plaintiff reopened his store in December

15 of 2006 and Defendant paid Plaintiff through April 2007.  The ambiguity created by Plaintiff's claim

16 that it was only "partially" operational during this time period only supports the proposition that a

17 genuine dispute existed as to the length of the period of restoration.

18     Third, Plaintiff contends that Defendant acted unreasonably by not utilizing the bank

19 statements and cancelled checks it produced for its calculation of the business income.  Defendants

20 argue that the bank statements and cancelled checks were insufficient to substantiate a loss greater than

21 what they had already paid.  As discussed previously, Defendant possessed legitimate concerns as to

22 the reliability and functionality of the bank statements, because the deposits did not specify whether

23 the funds were from sales at Plaintiff's place of business or money received from another source.

24 Similarly, as noted earlier, the cancelled checks submitted by Plaintiff did not always include the full

25 name of the payor and  in some instances did not provide a sufficient memo.  Thus, while it may be

26 unclear whether Defendant should have used the bank statements and cancelled checks in their

27 calculations, it is evident that they possessed reasonable grounds for rejecting their use in the business

28 income loss.

1    *5. Payroll*

2        Plaintiff contends that Defendant made no payroll payment on its claim.  This conclusory

3    allegation is unsupported by the record.  A "business income loss [is] based on...operating expenses,

4    including payroll expenses...." (Kwasniewski Decl., Ex. A p. 36.)  Therefore, while there may exist

5    a genuine dispute as to the amount owed Plaintiff under business income coverage, this allegation does

6    not imply that no payroll expense was factored into the business income valuation.  Therefore,

7    Defendant did not act in bad-faith by adhering to policy language and incorporating payroll losses into

8    its business income pay out.

9    *6. Mold*

10       Plaintiff argues that Defendant acted in bad faith by concealing policy coverages regarding

11   fungi or bacteria.  However, there is no evidence to show that the store was ever infested with fungi

12   or bacteria, and thus, there is nothing to show Defendant acted in bad faith by failing to disclose such

13   coverage.

14   *7. Experts*

15       Plaintiff argues Defendant "dishonestly selected its experts" and those "experts were

16   unreasonable" in their investigation of Plaintiff's claim. An expert's testimony "will not *automatically*

17   insulate an insurer from a bad faith claim based on a biased investigation." 171 Cal. App. 4th 785, 793

18   (2009) (quoting *Chateau Chamberay*, 90 Cal. App. 4th at 348 (emphasis in original)).  Here, however,

19   the only argument Plaintiff puts forth to suggest a biased investigation is the fact that Kinsel was hired

20   20 times by Defendant before Plaintiff's claim, and 30 to 40 times since.  Plaintiff cites *Hangarter v.*

21   *Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1011 (9th Cir. 2002), to suggest that when an

22   insurer continually uses the same expert, that expert loses his or her independence and becomes biased.

23   In *Hangarter*, however, there was additional evidence that in thirteen of thirteen cases, the expert

24   rejected the insured's claims.  *Id.* Here, Plaintiff does not point to anything in Kinsel's professional

25   history to suggest corruption and does not posit any evidence that improper collusion may have taken

26   place between Defendant and Kinsel.  Therefore, it would be an unreasonable inference to conclude

27   that Kinsel was a biased expert simply because it had worked for the Defendant on at least 20

28   occasions prior to evaluating the Plaintiff's claim. *See Anderson v. USAA Casualty Ins. Co.*, 2008 U.S.

1  Dist. Lexis 16514 at 24-25 (N.D. Cal 2008) ("[I]t would be too great a leap to conclude that [the

2  defendant's expert] was so corrupted simply because he had performed for [the defendant] on at least

3  twenty prior occasions.").

4                  *8. Insurance Code Violations*

5        Finally, Plaintiff argues that Defendant's bad faith is evidence by its violations of California

6  Insurance Code section 790.03(h).  However, as conceded by Plaintiff, violations of section 790.03(h)

7  do not give rise to a private right of action.  *Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal.3d

8  287, 313 (1988).  Rather, evidence that an insurance company violated regulations may support an

9  inference that the insurer acted unreasonably or in bad-faith.  *See Jordan v. Allstate Ins. Co.*, 148 Cal.

10  App. 4th 1062, 1077 (2007).  Here, however, Plaintiff has failed to raise a triable issue of fact that

11  Defendant acted in bad faith.  Accordingly, Defendant's alleged insurance code violations does not

12  save Plaintiff's claim.  *See Safeco Ins. Co. of America v. Parks*, 170 Cal. App. 4th 992, 1006 (2009)

13  ("An insurer's failure to comply with [an insurance] regulation does not, in itself, establish a breach

14  of contract or bad faith by the insurer."); *Rattan v. United Services Auto Ass'n.*, 84 Cal. App. 4th 715,

15  724 (2000) ("[A]ny particular violation of the regulations does not require a finding of unreasonable

16  conduct.").

17        In sum, Plaintiff has failed to raise a triable issue of fact regarding Defendant's bad-faith.

18  Accordingly,  Defendant's motion for summary judgment of Plaintiff's bad-faith claim is granted.

19      **C. Business and Professions Code section 17200**

20        Business and Professions Code section 17200 provides: "[U]nfair competition shall mean and

21  include any unlawful, unfair or fraudulent business act or practice."  Unlawful business activities

22  includes anything that can properly be considered a business practice and that at the same time is

23  forbidden by law.  *Smith v. State Farm Mut. Auto Ins. Co.*, 93 Cal. App. 4th 700, 717-18 (2001)

24  Virtually any law, civil or criminal, federal, state, or municipal, statutory or regulatory can serve as the

25  predicate for an action under the unfair competition law.  *Id.*  Plaintiff alleges that Defendant violated

26  sections 790.03, *et seq*, and the California Code of Regulations, Title 10, Chapter 5, subchapter 7.5.

27  (Compl. ¶ 53.)  However, Plaintiff cannot use the UCL to get around the fact that there is no private

28  right of action for violations of the Insurance Code.  *Safeco Ins. Co. v. Superior Court*, 216 Cal. App.

                                                  

3d 1491, 1494 (1990). Further, Plaintiff's only argument that Defendant violated the UCL is a conclusory statement that Defendant's conduct was unfair because of a "myriad of carrier conduct." Unfair business conduct is determined by an examination of the effect of that conduct on the plaintiff, balanced against the reasons, justifications and motives of the defendant. *Smith v. State Farm Mut. Auto Ins. Co.*, 93 Cal. App. 4th 700, 718 (2001) (citations omitted). As discussed above, Defendant's conduct did not rise to the level of bad-faith because Defendant had reasonable justifications for its actions, which were based on genuine coverage disputes. Plaintiff has failed to point to any additional conduct that would suggest that Defendant was unlawful, unfair, or fraudulent in its processing of Plaintiff's claim. Accordingly, Defendant's motion for summary judgment on Plaintiff's unfair competition claim is granted.

**D. Punitive Damages**

Defendant seeks summary judgment on Plaintiff's punitive damages claim. Punitive damages requires a plaintiff to prove, by clear and convincing evidence, that a defendant is guilty of oppression, fraud, or malice. Cal. Civ. Code § 3294. The higher standard of clear and convincing evidence applies at every stage of the litigation process, including summary judgment. *Baisch v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1121 (2001). "[A] plaintiff who is not able to survive summary judgment on an insurance bad-faith claim is also unable to survive summary judgment on a related claim for punitive damages." *Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1219, 1231 (C.D. Cal. 2002). Accordingly, Defendant's summary judgment motion on Plaintiff's punitive damages claim is granted.

**V.**

**CONCLUSION**

For these reasons, Defendant's motion for summary judgment is granted in part and denied in part. Specifically, Defendant's motion for summary judgment on Plaintiff's breach of contract claim is denied. Defendant's motion for summary judgment on Plaintiff's bad faith, unfair competition and punitive damages claims is granted.

**IT IS SO ORDERED**.

DATED: July 21, 2010

_____
HON. DANA M. SABRAW
United States District Judge

09cv839